## LORENZ v. UNITED STATES.

---

CRIMINAL LAW; CONSPIRACY TO DEFRAUD UNITED STATES; INDICTMENT; INSTRUCTIONS TO JURY; QUESTIONS FOR JURY; ELECTION AS BETWEEN SEVERAL COUNTS; PEREMPTORY CHALLENGES; EVIDENCE; CUSTOM AND USAGE; ADMISSIONS AS EVIDENCE IN CONSPIRACY CASES; ORDER OF PROOF; DOCUMENTARY EVIDENCE; PROOF OF HANDWRITING, WHEN NECESSARY; DEPARTMENTAL RECORDS AS EVIDENCE; CIRCUMSTANTIAL EVIDENCE; NON-PREJUDICIAL ERROR; CONFESSIONS; STATUTE OF LIMITATIONS; OVERT ACTS; POSTOFFICE INSPECTORS; DETECTIVES, VALUE OF EVIDENCE OF; DIRECTION OF VERDICT; IMPROPER CONDUCT OF COUNSEL.

1. *Quære,*—Whether, on a judgment of conviction of conspiracy under sec. 5440, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 3676), defining and punishing conspiracy to defraud the United States, on an indictment containing twelve counts, where the sentence upon each was not greater than warranted by the conviction under the first count, the judgment of the lower court might not be sustained, even if the insufficiency of the remaining counts be conceded.

2. Where, in an indictment for conspiracy containing several counts, the first count, by way of introduction, states the details of the alleged conspiracy, which statement is clearly meant to be applicable to all of the counts, and the remaining counts in charging the conspiracy expressly refer to the "same dishonest scheme and arrangement described and set forth in the first count," such reference will be held, after conviction, to have been sufficient to import into the remaining counts such introductory statement of the first count,—especially where the omission to repeat the averment of the first count was for-

VOL. XXVI—22

mal and no substantial rights of the accused could have been preju-
diced thereby. Such defect, if any, would seem to be cured by sec.
1025, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 720).

3. An indictment for conspiracy to defraud the United States under sec.
5440, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 3676), against the
former superintendent of a division of the Postoffice Department and
others, which charges him with the duty of ascertaining the price of
articles needed in the administration of the business of that division,
and when so ascertained within good faith advising his superior, the
First Assistant Postmaster-General, to order the purchase of and
payment for the same at such price, and with having procured the
purchase of certain articles so needed at more than they could have
been bought for, and with having confederated with his codefendants
in the doing of such an act,—sufficiently shows that the United States
was defrauded, and it is unnecessary to charge that the First Assist-
ant Postmaster-General was ignorant of the facts set out as the scheme
to defraud, or that he had been deceived and fraudulently imposed
upon by his subordinate, the conspiracy charged being one to defraud
the United States and none other. Knowledge of the First Assistant
Postmaster-General cannot in any event be imputed to the United
States, under such circumstances.

4. When an indictment for conspiracy to defraud the United States
charges the defendants, one of whom is a former officer of the United
States, with confederating to procure the purchase by the government
of necessary articles at excessive prices, and with several distinct acts
of purchase and the distribution of the purchase price among them-
selves; and the evidence showing each purchase of and payment for
the articles consists of official documents which necessarily show the
quantities purchased in each instance,—the refusal by the trial court
to instruct the jury, on behalf of the defendant, that the alleged ex-
cessive prices paid, and the evidence of the number of articles recom-
mended to be purchased, by such officer to his superior, or of his ac-
tivity in their introduction, cannot be considered as supporting the
charge of the excessive prices in determining the guilt or innocence
of any one of the defendants, is not error.

5. And it is not error for the trial court in such case to refuse to in-
struct the jury, on behalf of the defendants, that, if two of the de-
fendants, who were contractors, and who sold such articles to the gov-
ernment, did not offer them to the government for less than the price
at which they were sold, and that the price at which they were sold
was fair and reasonable, then there was no fraud on the United States,
and the defendants should be acquitted, where there was evidence of
a willingness on the part of such contractors to sell at a lower price,
and especially where the court gave an instruction telling the jury
that proof of the willingness of the contractors to sell at the lower
price was necessary to a conviction of the accused.

6. Nor is it error for the trial court to refuse an instruction asked by the defendants in such a case, that, if a conspiracy was entered into by two of the defendants to defraud the United States by the sale to the United States of such articles, but the other .two defendants, the contractors, were ignorant of such conspiracy, then all of the defendants should be found not guilty.

7. Nor is it error on the part of the trial court to refuse an instruction in such a case, asked by the defendants, to the effect that, if the government fixed the price of such articles before one of the defendants acquired any interest in such articles or the profits derived therefrom, or before he met either of his alleged coconspirators, the contractors, then the defendants must be acquitted. The evidence of such fact is proper for the consideration of the jury as a circumstance merely.

8. Whether a request by the accused in a criminal prosecution to require the government to elect upon which one of several counts of the indictment the defendants should be tried, should be granted, depends upon the special circumstances of the case, and rests in the sound discretion of the trial court.

9. The general policy of the legislation of Congress for this District has been to restrict the privileges of defendant in the matter of peremptory challenges, and to increase those of the prosecution, in criminal cases generally.

10. In construing a statute, courts will disregard the punctuation, or repunctuate, if need be, to arrive at the true meaning of the statute.

11. Where there are several defendants in a criminal prosecution in this District for an offense punishable by imprisonment in the penitentiary, they have ten peremptory challenges, to be, shared between them. (Construing sec. 918, D. C. Code.)

12. A subordinate official of the government, charged with others with conspiracy to defraud the government, cannot escape the consequences of his misconduct in the discharge of the official duties imposed upon him by departmental rules and usages, on the ground that those duties were imposed by law upon his superior in office, and therefore could not be lawfully intrusted to him. (Following *Tyner* v. *United States*, 23 App. D. C. 324.)

13. One who has been for years the private secretary to a government official, and then chief clerk in his office, is sufficiently well qualified to testify to the usage of the office.

14. In a prosecution for conspiracy to defraud the government by procuring the purchase by the government of necessary articles for an excessive price, where one of the questions is as to whether the manufacturers of the articles, who are named as defendants, were willing to sell the articles for less than the price paid by the government,

and another question is as to the relations between such defendants and a codefendant, who is charged with receiving part of the excessive purchase price and dividing it with another defendant, a government official, evidence tending to show the actual cost of the articles is immaterial.

15. Admissions made by alleged conspirators, but not in the presence of each other, after the termination of all acts in furtherance of the alleged conspiracy, are admissible when offered and received as evidence against the parties alone who made them, and when the jury are told that such evidence is to be considered by them, not upon the question as to whether the defendants are guilty of conspiracy, but only as tending to prove the relations each of the parties making the admissions may have had to any conspiracy that may have existed prior to that time.

16. Where, in a prosecution for conspiracy, some of the evidence for the prosecution, consisting of official documents bearing the indorsement of a former government official, who was one of the alleged conspirators, was objected to on the ground that, to justify its admission, there must first have been prima facie evidence of the existence of the conspiracy, it was *held* that the order of proof was within the sound discretion of the trial court, and that there did not appear to have been any abuse of that discretion.

17. In a prosecution of a former government official and others for conspiracy to defraud the United States by procuring the purchase of necessary articles at an excessive price, where it appears that the official received money from one of his codefendants which he claims was on account of the settlement of personal accounts existing between them, and not on account of the purchase price of the articles sold to the government, it is permissible for the prosecution, on the cross-examination of such official, to ask him whether he had any other sources of income than his official salary.

18. In a prosecution of a former Postoffice Department official and others for conspiracy in procuring the purchase by the government of patented letter-box fasteners used throughout the country, at an excessive price, letters addressed to the Department by the postmasters at Boston and Cleveland, unfavorably criticizing the fasteners, and letters of such former official relating to the distribution of the fasteners throughout the country, found in the files of the Department, are not admissible in evidence on behalf of the prosecution, whether the signatures of the writers are proved or not, there being no claim that the adoption of the fasteners by the government was fraudulently devised or procured; but the admission of such letters without proof of the signatures of the writers is error not prejudicial to the de-

fendants and not reversible, especially where the contents of one of the letters was subsequently stated by one of the defendants in his testimony, and the prosecution in its own testimony had shown the efficiency and superiority of the fasteners in question.

19. *Quære,* — Whether, under circumstances recited, the letters of a defendant in a criminal case, a former government official, were not admissible in evidence on behalf of the prosecution,—the question of whether they were written by the defendant to be left to the jury,— when they were shown to have been sent through the mails and placed in the official files, and to have been officially acted upon by such defendant, although his handwriting was not proved.

20. *Quære,*—Whether, in the prosecution of a former Postoffice Department official and others for conspiracy to defraud the United States in procuring the purchase by the government of necessary articles at an excessive price, where it appears that the purchases were made on orders initialed by him, which orders and other papers connected with them were audited as a matter of routine in the 6th Auditor's Office of the Department, the papers purporting to bear his initials taken from the files of such office are not admissible in evidence under sec. 889, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 671), without proof of the genuineness of such initials.

21. If certified copies of departmental records are admissible in evidence under sec. 889, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 671), there is no good reason why the originals should not be admitted.

22. Where papers initialed by a former departmental official, indicted with others for having conspired to defraud the government by procuring the purchase by the government of necessary articles . at an excessive price, and produced from the files of the Department, were admitted in evidence without proof that the initials were in the handwriting of such official, it was *held* that, even if error was committed in their admission, it was afterwards cured by testimony for the defendants that the initialing of such papers by such official was a matter of routine, sometimes done by him, and sometimes by a subordinate authorized by him to do so, and where on the trial he expressly assumed responsibility for the acts of such subordinate, saying that, if the latter had not initialed the papers, he would have done so himself.

23. In all cases where fraud and conspiracy must necessarily be established by circumstantial evidence, a wide range of evidence is permissible.

24. Where one charged with conspiracy with a government official and others to defraud the government by procuring the purchase by the government of necessary patented articles at an excessive price, testifies to having met such official on a boating trip shortly after having acquired an interest in the business of selling such articles to the

government, questions propounded by his counsel to show at whose invitation he took the trip, who accompanied him, and the names of other parties on the boat, are immaterial and incompetent.

25. Whether the trial court in a criminal prosecution erred in refusing to allow the defendants to ask certain questions on the cross-examination of a witness for the prosecution is immaterial, where the defendants afterwards, on examining the same person as their own witness, were permitted to ask and elicit answers to the same questions.

26. When there is a conflict of evidence as to whether a confession has been obtained by force or threats, or by holding out offers of immunity or reward, the question is one primarily for the decision of the trial court. If satisfied, the court may admit it, leaving its final determination to the jury. But where the circumstances under which it was obtained are such as reasonably to indicate that it was not voluntary, then it is an abuse of discretion to submit it to the jury at all.

27. Where a conspiracy is formed and a single overt act in aid of its object is committed beyond the statutory period of limitation before the finding of the indictment, and subsequent overt acts are committed within that period, then, through the repetition of such acts, the conspiracy is made a continuing offense, and by each of such acts it is repeated and entered into anew, and the prosecution is not barred.

28. Postoffice inspectors are not what is known as "detectives," but are men occupying responsible positions, who make no concealment of their duties and purposes; and, in a criminal prosecution depending in part upon their testimony, it is not error for the trial court to refuse to grant instructions asked by the defense, cautioning the jury against the testimony of detectives or of persons engaged to procure evidence against the accused,—especially where the jury, in the charge of the court, are instructed that they are to determine the weight of the evidence, and to pass upon the credibility of witnesses.

29. In a prosecution of four persons charged with conspiracy to defraud the United States by selling and procuring the sale to the United States of necessary articles at an excessive price, a motion by one of such defendants to direct a verdict on the ground of the insufficiency of the evidence to support a conviction, was *held* to have been properly refused by the trial court, upon a review by this court of the evidence,—especially in view of a written statement signed by him before the indictment was found, to the effect that no one but himself and his brother, one of his codefendants, was interested in the making and selling of such articles to the government, and that they paid no fees, and had no promoter to secure the adoption by the government of such articles,—where there was evidence tending to show that such statement was untrue.

30. Where the defense in a criminal case objected to certain improper remarks which were being made by the counsel for the prosecution in his address to the jury, whereupon the trial court interrupted counsel and they were discontinued, and no motion was made by the defense to discharge the jury, and no ruling by the court upon the subject was asked or made, this court refused to reverse a judgment of conviction, even though the remarks were such as would have warranted a reversal if they had been continued instead of having been interrupted by the court. Under such circumstances the trial court could not of its own motion have discharged the jury and ordered a new trial; nor could it have been expected to direct a verdict of acquittal. (Following *Yeager* v. *United States,* 16 App. D. C. 356.)

No. 1450. Submitted October 19, 1904. Decided December 13, 1904.

HEARING on an appeal by the defendants from a judgment of conviction of the Supreme Court of the District of Columbia sitting as a criminal court, entered upon the verdict of a jury finding them guilty on an indictment for conspiracy to defraud the United States. *Affirmed.*

The COURT in the opinion stated the case as follows:

The appellants, George E. Lorenz, August W. Machen, Diller B. Groff, and Samuel A. Groff, together with Martha J. Lorenz, wife of George E. Lorenz, were tried in the supreme court of the District of Columbia on an indictment for conspiracy to defraud the United States. The trial resulted in a verdict of not guilty, by direction of the court, as to Martha J. Lorenz, and of guilty as to the other defendants. Motions for new trial and in arrest of judgment having been overruled, each of them was sentenced to be imprisoned and kept at labor in the West Virginia penitentiary for the term of two years, to take effect from date of arrival thereat, and in addition to pay a fine of $10,000. From this they have regularly prosecuted their appeals.

The indictment, presented June 22, 1903, contains twelve counts. It contains, first, a general recital substantially as follows: That on and before June 1, 1900, and since, there were

and have been in use in the postal service throughout the United States a great number of letter boxes which were fastened to posts by devices called letter-box fasteners. That there was in the Postoffice Department a First Assistant Postmaster-General to whose office was assigned, among other duties, that of furnishing supplies for the postal service, including letter boxes and their fasteners. That for the administration of the affairs of this office there was a division known as the free-delivery division to which was assigned the consideration of allowances for said boxes and fasteners, under the supervision of the said First Assistant Postmaster-General, which said division before and on June 1, 1900, and until July 1, 1901, was under the management of a superintendent; thereafter, until May 1, 1903, the manager was called general superintendent, but without change of duties. That during the times aforesaid August W. Machen was such superintendent and general superintendent. That as such officer said Machen was charged with the duty of considering and determining in good faith, from time to time, whether the purchase of such letter-box fasteners was required for use in the postal service, as well as the number required, and the lowest price to the United States at which the same could be obtained, and of advising the First Assistant Postmaster-General in the premises in good faith, and recommending to him that such purchases be made at such price, when deemed by said Machen, in good faith, to be necessary; and further, with the duty of examining and approving the bills for purchases and recommending the payment of the same. That in the usual course of business in the office of the First Assistant Postmaster-General purchases so made would be approved upon the recommendation of said Machen, and the bills paid. That Diller B. and Samuel A. Groff, doing business as Groff Brothers, were engaged in the business of selling letter-box fasteners constructed under a patent issued to them. That said fasteners consisted of two parts, one of which was attached to the box and the other to the post, and that the two parts together were called a complete fastener, and each part separately a half fastener. That, at time of the commission of the offenses set

forth in this count and "set forth hereinafter in the several other counts of this indictment," the cost of the manufacture of said fasteners was 25 cents for a complete fastener, and the same for each two of the half fasteners; and that they could have been sold at a great profit for 75 cents. That the said Groff Brothers "were willing and desired to sell, furnish, and deliver" such complete and half fasteners for said last price, and that they could have been obtained from them at a cost not exceeding the same. Thereupon the grand jurors presented:

"That on the 29th day of June, in the year of our Lord 1900, and at the District aforesaid, the said George E. Lorenz, Martha J. Lorenz, August W. Machen, Diller B. Groff, and Samuel A. Groff unlawfully did conspire, combine, confederate, and agree together to defraud the said United States of its moneys, in the dishonest manner and through and by means of the dishonest scheme and arrangement following; that is to say, that he, the said August W. Machen, should by and through advice to be given and recommendation to be made in that behalf, to the said First Assistant Postmaster-General by him, the said August W. Machen, as such superintendent, procure and be instrumental in procuring, so far as in him the power lay, the purchase by the said Postoffice Department from the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, of a large number of such complete fasteners and half fasteners, of the kind so known as Groff fasteners, for the use aforesaid, at the price of $1.25 for each of such complete fasteners and at the price of $1.25 for each two of such half fasteners; and should in like manner as such superintendent procure and be instrumental in procuring payment by the said United States to them, the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, for such complete fasteners and half fasteners last aforesaid at the prices, respectively, last aforesaid; and that upon such procuring by him, the said August W. Machen, as last aforesaid, of such purchase last aforesaid, to be made, and upon such procuring by him, the said August W. Machen, as last aforesaid, of such payment last aforesaid to be made, and in consideration thereof, they, the said Diller B. Groff and Samuel

A. Groff, partners as aforesaid, should retain and keep for the use of them, the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, a certain proportion only of such payment last aforesaid, to wit, 60 per centum thereof, being at the rate of 75 cents for each such complete fastener, and at the rate of 75 cents for each two of such half fasteners last aforesaid, so purchased by the said United States, and should pay to the said George E. Lorenz and Martha J. Lorenz, or to one or other of them, to be converted, appropriated, and applied to the use of them, the said George E. Lorenz, Martha J. Lorenz, and August W. Machen, a certain proportion, to wit, 40 per centum of any such payment last aforesaid, made by the said United States, and being at the rate of 50 cents for each of such complete fasteners and of 50 cents for each two of such half fasteners last aforesaid, so purchased by the said United States."

Then follows the charge of an act done in pursuance of said conspiracy, to the effect that Machen, on June 30, 1900, advised the purchase of 6,000 of said complete fasteners at the price of $1.25 each; that said Groffs presented a bill therefor at said price, the payment of which was recommended by said Machen to the First Assistant Postmaster-General; that the sum of $7,500 was thereupon paid by the United States to said Groffs, who, in pursuance of said agreement, paid over to said George E. and Martha J. Lorenz, on October 20, 1900, the sum of $3,000.

The second count charges that the defendants on July 1, 1900, unlawfully did further conspire, etc., "to defraud the United States of its moneys in the same dishonest manner, and through and by means of the same dishonest scheme and arrangement set forth in the first count hereof." Then follows the charge of the recommendation of purchase, the purchase and payment of and for 5,000 complete fasteners, and 2,087 half fasteners at the same price and under the same circumstances as before, and the payment therefrom to Lorenz and wife of $3,020.74.

The third count, under a similar charge of conspiracy, charges the purchase of and payment for 10,004 half fasteners

on July 9, 1900, for which the Groffs received $6,252.50, and out of which they paid Lorenz $2,501.

The fourth count, under the like charge of conspiracy, avers the purchase of and payment for 6,000 complete fasteners on October 21, 1900, for which the Groffs received $7,500, and out of which they paid Lorenz $3,000.

The fifth count begins thus:

"And the grand jurors aforesaid, upon their oath aforesaid, do further present:

"That on the 1st day of July in the year of our Lord 1901 and at the District aforesaid, the said George E. Lorenz, Martha J. Lorenz, August W. Machen, Diller B. Groff, and Samuel A. Groff, unlawfully did further conspire, combine, confederate, and agree together to defraud the said United States of its moneys in a dishonest manner and through and by means of the dishonest scheme and arrangement following; that is to say: That he, the said August W. Machen, should by and through advice to be given and recommendation to be made in that behalf to the said First Assistant Postmaster-General, by him, the said August W. Machen, as such general superintendent, procure and be instrumental in procuring, so far as in him the power lay, the purchase by the said Postoffice Department from the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, of a large number of such complete fasteners and half fasteners, of the kind so known as Groff fasteners, for the use of said postal service at the price of $1.25 for each of such complete fasteners, and at the price of $1.25 for each two of such half fasteners, last aforesaid; and should in like manner, as such general superintendent, procure and be instrumental in procuring payment by the . said United States to them, the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, for such complete fasteners and half fasteners last aforesaid, at the prices respectively last aforesaid; and that upon such procuring by him, the said August W. Machen, as last aforesaid, of such purchase last aforesaid, to be made, and upon such procuring by him, the said August W. Machen, as last aforesaid, of such payment last aforesaid, to be

made, and in consideration thereof they, the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, should retain for the use of them the said Diller B. Groff and Samuel A. Groff, partners as aforesaid, a certain proportion only of such payment last aforesaid, to wit, 60 per centum thereof, being at the rate of 75 cents for each such complete fastener and at the rate of 75 cents for each two of such half fasteners, last aforesaid, so purchased by the said United States, and should pay to the said George E. Lorenz and Martha J. Lorenz, or to one or other of them, to be converted, appropriated, and applied to the use of them, the said George E. Lorenz, Martha J. Lorenz, and August W. Machen, a certain proportion, to wit, 40 per centum of any such payment last aforesaid made by the said United States and being at the rate of 50 cents for each of such complete fasteners and of 50 cents for each two of such half fasteners, last aforesaid, so purchased by the said United States."

The act charged in pursuance of this conspiracy is the recommendation of purchase and the purchase of 2,050 complete fasteners and 1,182 half fasteners on July 1, 1901; the recommendation of payment to Groff Brothers of $3,301.25; their receipt of the same, and payment to Lorenz of $1,271.

The sixth count charges the conspiracy, etc., as set forth in the fifth count and, under like averments of recommendations, etc., charges the purchase, on July 2, 1901, of 2,164 half fasteners, the payment to the Groffs therefor of $1,352.50, and their payment in turn to Lorenz of $724.98.

Counts 7, 8, 9, 10, 11, and 12 charge a conspiracy as set forth in count 5 and allege the following acts of purchase from and payments to and by Groff Brothers, which are here condensed into the following statement:

Count 7: July 3, 1901, 6 half fasteners. July 13, 3,000 half fasteners. August 2, 8 half fasteners. Payment November 14, 1901, to Groff Brothers of $1,883.75, and by them to Lorenz of $753.50.

Count 8: August 25, 1901, 5,000 complete fasteners. January 9, 1902, payment to Groffs of $6,250, and by them to Lorenz of $2,500.

Count 9: December 5, 1901, 5,000 complete fasteners. April 1, 1902, payment to Groffs of $6,250, and by them to Lorenz of $2,360.56.

Count 10: June 30, 1902, 3,000 complete fasteners. July 9, 1902, 5,000 half fasteners. July 11, 1902, 200 complete fasteners. July 1, 1902, 3,000 complete fasteners. Payments to Groffs for said purchases, between July 24 and August 29, 1902, in all, $10,875, and by them to Lorenz of $4,350.

Count 11: July 9, 1902, 5,000 complete fasteners. October 22, 1902, payment to Groffs, $6,250, and by them to Lorenz, $2,500.

Count 12: August 21, 1902, 5,000 complete fasteners. October 11, 1902, payment to Groffs, $6,250, and by them to Lorenz, $2,500.

The evidence recited in the bill of exceptions tended to show the following facts: That, as averred in the indictment, the defendant, Machen, had been from September 16, 1893, to July 1, 1901, superintendent, and from July 1, 1901, to May 26, 1903, general superintendent of the free-delivery division in the office of the First Assistant Postmaster General, under whose general supervision the same was. That it was Machen's duty to inform himself of the necessity for the purchase of supplies for the free-delivery service, which included letter-box fasteners, of the quantities required, and the price of the same, and to advise the First Assistant Postmaster-General concerning the same. That purchases were authorized by him upon Machen's advice. That the regular custom of the office was that a letter, order, or requisition would be prepared in Machen's division stating the articles and the quantity desired and the prices to be paid, upon which he would place his name or initials as an indication that he advised the purchase, and as an assurance that the said paper was proper to be signed by the First Assistant Postmaster-General. That upon the signature of the latter the purchase was concluded at the prices named. That when the bills therefor were presented they were in like manner approved by Machen before payment was ordered by the First Assistant Postmaster-General. That the latter had such a mass

of documents to sign daily that it was impossible for him to acquaint himself with the details of purchases made, or to inform himself of the necessity therefor, and of the quantities and prices thereof. That he was accustomed to rely upon the advice given him by Machen, as indicated by his name or initials upon the order, as to the correctness of the same and the propriety of signing it. That when an article had been once adopted it was then the custom of the Postmaster-General to approve further orders therefor, made in the ordinary course at a matter of routine, relying upon the knowledge and honesty of the superintendent recommending the same.

That in 1894 Samuel A. Groff received a patent for a new letter-box fastener, a device shown to be simpler in construction than, and superior to, the one then in use, and had assigned a half interest therein to his brother, Diller B. Groff. That he received permission to attach his fastener to a box in use in Washington, through correspondence with Machen, in order to attest its practical advantages. That in July, 1895, the first order for Groff fasteners was made in the manner usual in such cases upon Machen's recommendation, at the price of $1.50 for the complete fastener. That during the period between that time and July 1, 1899, many other purchases were made in the same manner and at the same price for use in the offices at Baltimore, Philadelphia, and some other places. That in the beginning purchases were made on the requisitions of postmasters, but later they were made for use in Boston, New York, Brooklyn, and Chicago without such requisitions and upon the suggestion of Machen. That upon July 15, 1899, an order for complete fasteners was recommended by Machen at the price of $1.25, which the Groffs, first protesting against, accepted, and thereafter all purchases had been made at that price. That the bill for said first purchase, amounting to $3,503.75, was approved in the usual manner and paid to Diller B. Groff by draft on the Treasury. That the same was deposited in bank by Diller B. Groff, who, two days thereafter, to wit, November 25, 1899, drew a check on said bank in favor of Samuel A. Groff for $688.25, which was paid, and on the same day drew another

in favor of George E. Lorenz for $1,401.50. That said Lorenz deposited the same in the Home Savings Bank, of Toledo, Ohio, on November 27, 1899, to the credit of Martha J. Lorenz, and on the same day drew thereon, as he was authorized to do, and received the sum of $800. That on the same day he purchased a draft of said bank for $500 in favor of Machen, and deposited the remainder in the National Bank of Commerce of said city to his own credit. That on the same day he purchased a draft of said last bank for $200.75 payable to said Machen. That both of said drafts were sent to said Machen, who, on November 28, 1899, transmitted them, duly indorsed, to the Union National Bank, of Westminster, Maryland, where they were entered to his credit, the same amounting to one half of the sum received by Lorenz from Groff. That thereafter, January 12, 1900, a warrant for another purchase was issued to Groff Brothers for $5,156.88, and a few days later they transmitted to Lorenz by draft the sum of $2,062.74. That said sum was deposited in bank at Toledo to the credit of Mrs. Lorenz, and a draft drawn by Machen for the sum of $1,031 was paid by George E. Lorenz.

Further testimony tended to show that, as charged in the various counts of the indictment, purchases of fasteners were made in the same manner, on divers dates, from June 30, 1900, to and including August 22, 1902; that out of the money received from the same the Groffs regularly transmitted 40 per cent thereof to George E. Lorenz, who regularly paid the said Machen about one half of the same, as received by him from time to time; that in a majority of the instances the remittance · by Lorenz to Machen was exactly one half of each payment made to the former by the Groffs; that the total number of fasteners so purchased amounted to about 106,000, and that Lorenz received from the payments therefor about $53,000; that $29,342.28 were paid to Lorenz during the period charged in the indictment, and that during the same time Machen received from Lorenz about the sum of $15,306.27.

The evidence tended to show that all orders for the purchase of fasteners were made in reliance upon the recommendations

from the office of Machen, bearing his name or initials, and
that the payments were similarly ordered. (In some instances
testimony tended to show that these initials were not written
by Machen, but by his chief clerk, Miss Liebhart, and in others
that they were recommended by others acting in his stead dur-
ing absence. These will be noted in considering exceptions
taken upon objections made to their introduction.)

Other evidence tended to show that the cost of manufacture
of each complete fastener during the period was first 25 cents
and later 20 cents, and that the same was paid by Diller B.
Groff for the Groff Brothers.

Other evidence tended to show that Machen had formerly
lived in Toledo; that Lorenz had been postmaster of that city
from 1896 to 1900, and that Machen had been employed in the
office as chief of the registry division and as assistant post-
master. That Lorenz and Machen had been associated together
in several business enterprises thereafter until Machen's re-
moval to Washington in 1893, and that they were intimate
friends. That Lorenz and wife were in Washington early in
1900 and sometime thereafter.

Other evidence tended to show the bank accounts of George
E. and Martha J. Lorenz in various banks of Toledo, Ohio;
that deposits made to the credit of Martha J. Lorenz were sub-
ject to the draft of each, and that some of the drafts sent to
Machen were signed by said Martha J. Lorenz.

Other evidence tended to show declarations and statements
of the defendants made to inspectors of the Postoffice Depart-
ment, who were investigating the aforesaid transactions prior
to the commencement of the prosecution. In some instances
these had been reduced to writing, sworn to and subscribed.
S. A. Groff said that his brother attended to the entire busi-
ness; "no one but my brother and myself are interested in the
fasteners; no others directly or indirectly. We paid no fees
and had no promoters to secure the adoption of the fasteners
by the Department."

Diller B. Groff stated, among other things, that no interest,
direct or indirect, in the fasteners was held by anyone in the

Postoffice Department; that no one was interested in the patent or business but himself and his brother; and when told they had traced payments by him to Lorenz, and the request made to produce the checks, that he refused to show any checks, and said that he had never heard of George E. or Martha J. Lorenz. Martha J. Lorenz said that she did not know Diller B. Groff; that she had not received within the past two or three years large sums of money from Washington and other places East; that she knew nothing of remittances to Machen; that she had a small personal bank account; that her husband attended to paying Machen's taxes and things of that kind. George E. Lorenz, when asked questions, said he had nothing to tell, but said that he had not received a draft from the Postal Lock & Device Company for $5,441. He declined to answer whether he had received large sums of money from postoffice contractors in the East, saying it was none of their (the inspectors') business. He declined to answer whether he knew Diller B. Groff, or whether his refusal to answer questions was because he was afraid of incriminating himself. He said that he had been in Washington a week or two before, but refused to answer whether or not he had gone in response to a summons from Machen. The statements made by Machen were referred to only in his cross-examination as a witness, and his declarations are not given.

Each of the defendants gave testimony denying any corrupt agreement or conspiracy, the Groffs denying any knowledge that Machen received an interest in the proceeds of sales.

Lorenz testified that being in Washington in July, 1895, he happened to notice the neatness of a letter box near the post-office; that he went to examine one in the postoffice building, and while so engaged Samuel A. Groff, whom he had not known before, came in and explained the working of it. That he called Groff aside and asked what they were doing with it. That Groff said that he had succeeded in getting it established here, but hardly knew how to go ahead with it. That he inquired if he could get an interest in it, and was referred to Diller B. Groff, as he looked after the business. That the next

day he saw Diller B. and, after some negotiation, an agreement was made by which he agreed to give a one-half interest in the profits, in consideration of $500 to be paid and the services of Lorenz in inducing postmasters to recommend the device. That the agreement was not reduced to writing, but $50 were paid. That witness had not seen Machen on that visit, had heard nothing from him, and did not mention to Groff the fact of his acquaintance and intimacy with Machen. That he saw Machen on an excursion boat on Lake Erie in August of the same year and casually mentioned his Washington arrangement. That Machen told him he (Lorenz) could not forward the matter at all, because the Department had already adopted the fastener, and it would be purchased as far as the appropriations warranted. That he, Lorenz, made no attempt to influence orders from postmasters because of this information, and that he had done nothing whatever in that line. That on October 8, 1895, he prepared two typewritten contracts which he signed and sent to the Groffs for a like purpose. These were returned by the latter unsigned, and have been lost. Witness produced some scraps of a letter, which he said was returned with the contracts, that had been found in a waste basket. That he saw D. B. Groff a month or two after that, but no contracts were drawn or signed; the business was satisfactory and the contracts were neglected or forgotten. That there was never a misunderstanding of the agreement.

Diller B. Groff's testimony tended to show that such an agreement had been had between him and Lorenz; that the contracts sent had not been signed because they provided for a half interest in the patent, instead of in the profits of sales made in the United States; that Machen's name had not been mentioned; that the $50 were paid down, and the remainder of the $500 promised had been deducted in making remittances to Lorenz from the profits on early sales thereafter; that he had paid Lorenz each time that a sale had been effected his share of the profits,— that is to say, of the amount received after deducting the cost of manufacture; that witness had no arrangement with Machen, had not talked with him about the matter, and

had not heard that he had an interest. The testimony of Machen tended to show the manner in which the business of the office had been conducted; that the volume was so great that he could not examine everything, and had to rely upon subordinates in making up orders, examining bills, and the like; that these matters were chiefly routine work. He said that he had made the orders adopting the Groff fastener because of its excellence, and had reduced the price from $1.50 to $1.25 of his own motion; that he had no interest in it whatever, and had no arrangement of any kind with Lorenz, and all that he knew of Lorenz's interest was through the casual conversation on the boat, as testified to by Lorenz.

Both Lorenz and Machen testified to their interest in certain oil producing and refining properties at or near Toledo, and to the indebtedness and financial embarrassments of the same;. that finally after Machen came to Washington, in the spring of 1893, he sold his interest to Lorenz, upon an estimated valuation, and took his note therefor for $25,000, payable in five years, without interest. The note was produced by Lorenz and showed indorsements of credits by Machen. Both testified that each and every remittance by Lorenz, made from his receipts from Groff, was a payment on account of this note, made in good faith and intended as such payment only.

Samuel A. Groff testified to the casual meeting with Lorenz, the explanation of the fastener, and Lorenz's suggestion as to an interest. That, after inquiring and learning that Lorenz had been postmaster at Toledo, he took him to his brother, who attended to all the business. That he had no knowledge of any corrupt agreement, and that the arrangement with Lorenz was made by his brother because he thought it important to procure extensive sales of the fastener. That he kept no account of the money received by him from Diller B. Groff, and had nothing whatever to do with the business or keeping accounts; had been perfectly satisfied with his brother's management and payments to him. He denied the correctness of his sworn statement to the inspectors in this respect: "I said nobody directly or indirectly was interested in the patent. I did not say fastener."

A great many documents and letters were read in evidence in the course of the trial tending to establish certain of the facts and circumstances above mentioned. Certain of these are hereafter described in connection with exceptions taken to their admission.

*Messrs. Douglass & Douglass* and *Mr. Conrad H. Syme* for the appellant August W. Machen; *Mr. Samuel Maddox* for appellants Diller B. Groff and Samuel A. Groff; and *Mr. John S. Kumler*, for appellant George E. Lorenz:

1. Counts 2 to 12, inclusive, of the indictment do not state a cause of action, there being no reference in them sufficient to import into them the first 7 paragraphs of count 1, and without such allegations they are unintelligible and insufficient. At common law such allegations as are contained in count 1 could not have been read into each succeeding count without any reference thereto. 1 Bishop, Crim. Proc. §§ 426, 431, 3d ed. §§ 132, 426, 429; 10 Enc. Pl. & Pr. pp. 540, 541; *State* v. *Lyon,* 17 Wis. 245; *Queen* v. *Waverton,* 17 Q. B. 562; Chitty, Crim. Law, 175, 249; *State* v. *McAllister,* 26 Me. 374; Malonis, Crim. Briefs, 34, and cases cited; *State* v. *Longley,* 10 Ind. 482; *State* v. *Phelps,* 65 N. C. 450; Wharton, Crim. Pl. & Pr. 9th ed. § 95; *State* v. *Lea,* 1 Coldw. 175. The common-law rule has not been abrogated or modified, by statute or otherwise. U. S. Rev. Stat. § 1025; *Blitz* v. *United States,* 153 U. S. 308; *Craim* v. *United States,* 162 U. S. 625; *United States* v. *Peters,* 87 Fed. 984; *Peters* v. *United States,* 94 Fed. 127; *United States* v. *Jolly,* 37 Fed. 103.

2. The indictment does not contain the necessary averments of fact to constitute a case of conspiracy to defraud. As to what are the essential ingredients of actual or moral fraud, see *Shappirio* v. *Goldberg,* 20 App. D. C. 193; *Security Invest. Co.* v. *Garrett,* 3 App. D. C. 69; *Atlantic Co.* v. *James,* 4 Otto, 207; *Clark* v. *Harmon,* 9 App. D. C. 10; *Peck* v. *Haley,* 21 App. D. C. 225; 8 Enc. Pl. & Pr. pp. 899, 906; *Newbury* v. *Garland,* 31 Barb. 121; *Van De Sande* v. *Hall,* 13 How. Pr.

458; *Cox* v. *Highley,* 100 Pa. 249; *Sheldon* v. *Davidson,* 85 Wis. 138; *Lincoln* v. *Ragsdale,* 9 Ind. App. 555; *Dicky* v. *Leonard,* 78 Ga. 121; *Jasper* v. *Hamilton,* 3 Dana, 280; 9 Enc. Pl. & Pr. pp. 868, 690; *Cohen* v. *Guildman,* 76 N. Y. 284; *People* v. *McKenna,* 81 Cal. 158; *United States* v. *Milner,* 36 Fed. 890; *Lambert* v. *People,* 9 Cow. 578; *Benson* v. *United States,* 17 C. C. A. 275; *Carl* v. *United States,* 105 U. S. 611.

3. If the Groffs did not name or receive an excessive price for the fastener, and did not use Lorenz as a connecting link between themselves and Machen, and if they had never offered and were never willing to sell at a price other than that actually received, the whole scheme and theory of fraud, as stated in the indictment, must fall, and appellants' 11th, 12th, 13th, 19th, and 26th prayers should have been granted. 1 Greenl. Ev. § 51; Wright, Criminal Conspiracy, 219; 22 Enc. Pl. & Pr. p. 579.

4. The trial court should have granted the appellants' request that the prosecution should be required to elect on which one of the twelve counts of the indictment the appellants should be tried. While ordinarily this is a question within the sound discretion of the trial judge, such discretion should be governed by rule, and not by humor. There was an abuse of discretion in this case. *Platt* v. *Monroe,* 34 Barb. 293; *Logan* v. *United States,* 144 U. S. 309.

5. Each of the appellants was denied his rightful number of peremptory challenges in the impaneling of the jury. As to trial by jury and the right of peremptory challenge at common law, see Story, Const. Law, § 791; *Callan* v. *Wilson,* 127 U. S. 540; *United States* v. *Insurgents of Pennsylvania,* 2 Dall. 342; *Murry* v. *Hoboken Land Co.* 18 How. 272; *Lewis* v. *United States,* 146 U. S. 370; *United States* v. *Marchant,* 12 Wheat. 480; 4 Bl. Com. 353; *Shumaker* v. *State,* 5 Wis. 324; *United States* v. *Dunn,* 3 Mackey, 151; *Pointer* v. *United States,* 151 U. S. 408; Coke's 3d Inst. 27, chap. 2. D. C. Code, § 918, supersedes § 819, U. S. Rev. Stat. The crime of conspiracy here charged is punishable by imprisonment in the

penitentiary, and is an infamous crime (*Mackin* v. *United States,* 117 U. S. 348; *United States* v. *Brady,* 1 Mackey, 588), though technically a misdemeanor at common law.  *Barron* v. *United States,* 156 U. S. 467.  Section 918, D. C. Code, is unambiguous, and its clear meaning is to secure to the appellants, jointly indicted of a crime punishable by imprisonment in the penitentiary, ten peremptory challenges each.  For rules of statutory construction applicable, see *Smith* v. *State,* 66 Md. 217; *United States* v. *Fisher,* 2 Cranch, 358; *Refrigerator Co.* v. *Sulzebergerm,* 157 U. S. 33; *Loan & T. Co.* v. *Oregon & C. R. Co.* 24 Fed. 410.  Unless the statute expressly or impliedly provides the contrary, a defendant who is tried jointly with others is entitled to the same number of peremptory challenges as if he were tried alone.  17 Am. & Eng. Enc. Law, 2d ed. p. 1182; *Hill* v. *State,* 2 Yerg. 246; *Wiggins* v. *State,* 1 Lea, 738; *Cruce* v. *State,* 59 Ga. 88.  See also *United States* v. *Marchant,* 4 Mason, 159; *Brister* v. *State,* 26 Ala. 127; *State* v. *McLean,* 21 La. Ann. 546; *Bixbee* v. *State,* 6 Ohio, 86; *State* v. *Stoughton,* 51 Vt. 364; *Schoeflee* v. *State,* 6 Wis. 823.  Section 918, D. C. Code, if construed as was done by the trial court, will become an instrument of oppression where equalization was intended.  By simply joining with a man accused of a capital crime one, two, or twenty innocent persons in the indictment, the government can restrict, or entirely take away, his right of peremptory challenge.  For who shall say to whom that right appertains if claimed by each and all of the indicted persons?  This measurably happened in the case at bar, for Martha J. Lorenz was indicted with the others, although the prosecution failed to even make out a prima facie case against her.  And appellants Groff had between them three challenges, just the number each would have been allowed if charged with failure to speedily remove from a city sidewalk sand and gravel left there after a rain storm in front of an abutting lot belonging to the one or the other.

6. The letters from the postmasters at Boston and Cleveland should not have been admitted in evidence because the signatures were not proved; but, even if the signatures had been

proved, they were not competent. *Bass* v. *United States,* 20 App. D. C. 242. They were declarations of third parties. 9 Am. & Eng. Enc. Law, 2d ed. p. 6. The letters, papers, and other writings purporting to be initialed by Machen were not admissible as they were not sufficiently proved. 11 Am. & Eng. Enc. Law, 2d ed. pp. 585–588; *Curtis* v. *Hall,* 4 N. J. 167; Greenl. Ev. 576, 577; 15 Am. & Eng. Enc. Law, 2d ed. p. 255; *Bruce* v. *Crews,* 99 Am. Dec. 467; *Slaymaker* v. *Boyd,* 1 Penr. & W. 216; *Carrier* v. *Hampton,* 11 Ired. L. (N. C.) 307; *Wimbish* v. *State,* 89 Ga. 294; *Lynn* v. *Ross,* 16 N. J. L. 56.

7. The prosecution did not stand upon any right to offer in evidence certified copies of papers from the Sixth Auditor's office, but offered the originals themselves, and it was its duty to furnish the necessary proof of the identity of said papers and Machen's connection therewith. The several papers and documents objected to were offered by the prosecution as evidence of overt acts on the part of Machen in the pursuance of the conspiracy charged, and prejudice must have resulted to all the defendants from this decision.

8. The court erred in admitting in evidence declarations and acts of one or more of the defendants as evidence against all of them, without prima facie proof of the existence of an agreement, conspiracy, or confederation between them. 3 Greenl. Ev. § 94; Wharton, Crim. Ev. § 698; Wright, Criminal Conspiracy, pp. 212–214; Underhill, Crim. Ev. § 492; *Drake* v. *Stewart,* 22 C. C. A. 107; *People* v. *Parker,* 67 Mich. 222; *Territory* v. *Turner,* 37 Pac. 368; *Browning* v. *State,* 30 Miss. 656; *State* v. *Thompson,* 69 Conn. 725; *Page* v. *Parker,* 40 N. H. 62; *Am. Fur Co.* v. *United States,* 2 Pet. 364; *Bannon* v. *United States,* 156 U. S. 464. See also *Clayton* v. *Anthony,* 6 Rand. (Va.) 285; *United States* v. *Cole,* 5 McLean, 513; *Rex* v. *Stone,* 6 Tenn. 527; *Preston* v. *Bowers,* 13 Ohio St. 1; *Com.* v. *Brown,* 14 Gray, 419; *Kimmell* v. *Geeting,* 2 Grant, 125; *Price* v. *Jones,* 4 Watts, 85; *Lee* v. *Lamprey,* 43 N. H. 13; *Carskadon's Case,* 7 W. Va. 679; *Caine's Case,* 20 W. Va. 679; *Burke* v. *Miller,* 7 Cush. 547; *Hesler* v. *McGrath,*

58 Pa. 458; *Benford* v. *Sanner,* 40 Pa. 9; *Phœnix Ins. Co.* v. *Moog,* 78 Ala. 284; *Armsby* v. *People,* 53 N. Y. 472; *Com.* v. *Crowninshield,* 10 Pick. 497; *State* v. *Ross,* 29 Mo. 51; *Miller* v. *Barber,* 66 N. Y. 558; 2 Starkie, Ev. 401, 403; 6 Am. & Eng. Enc. Law, 2d ed. p. 867.

9. When overt acts are alleged, they constitute in law a bill of particulars, and the prosecution is bound by, and limited by, the overt acts thus alleged. 8 Enc. Law & Pr. p. 684; *Reg.* v. *Steel,* 41 E. C. L. 187; *Reg.* v. *Esdaile,* 1 Fost. & F. 213; 3 Greenl. Ev. 96; *McDonald* v. *People,* 126 Ill. 150; Wright, Criminal Conspiracy, 209.

10. The trial court erred in refusing to allow the appellants to interrogate Lorenz with reference to the circumstances of his meeting Machen on a boating trip in August, 1895, and with reference to the names of the persons who constituted the party on the trip, and who invited Machen and Lorenz to accompany the party, as it was important for the appellants to show that Lorenz had not sought out Machen for the purpose of improperly influencing him or conspiring with him to defraud the government. Want of apparent motive is a relevant fact in favor of the accused, and is admissible. Chamberlayne's Best, Ev. § 453; *White* v. *State,* 35 Ind. 595; *Greer* v. *State,* 53 Ind. 420; *State* v. *Harrington,* 12 Nev. 126. See also *Fenwick* v. *State,* 63 Md. 239; *Fisk* v. *Chester,* 8 Gray, 508; *Roddy* v. *Finnegan,* 43 Md. 501; *Lombard* v. *Oliver,* 2 Allen, 155; *Com.* v. *Hill,* 145 Mass. 305.

11. The trial court erred in admitting in evidence the sworn statement of Diller B. Groff, taken by the postoffice inspectors on April 3, 1903, and in submitting to the jury the question whether it was voluntarily made, as the statement was made under duress and at a time when Groff was ill and under the impression that the inspectors had authority to compel him to make a statement. *People* v. *McMahon,* 15 N. Y. 386; Greenl. Ev. § 226; *Reg.* v. *Wheely,* 8 Car. & P. 250; *Reg.* v. *Owen,* 9 Car. & P. 238; *Reg.* v. *Kingston,* 4 Car. & P. 387; *Reg.* v. *Partridge,* 7 Car. & P. 557; *Reg.* v. *Fleming,* Arm. M. & O. 360; cited in 168 U. S. 553; 3 Russell, Crimes, 501; *Bonner*

v. *State,* 55 Ala. 245; *Wilson* v. *United States,* 162 U. S. 613; *Bram* v. *United States,* 168 U. S. 532; *State* v. *Rorie,* 74 N. C. 148, cited in 168 U. S. 542. It is the duty of the trial court, without the aid of the jury, to determine whether a statement was voluntarily made, before it can be admitted in evidence. 1 Phillipps, Ev. 543; 1 Greenl. Ev. § 219; *Bonner* v. *State,* 55 Ala. 246; *Burton* v. *State,* 39 Fla. 183; *United States* v. *Nott,* 1 McLean, 501; *Nicholson* v. *State,* 38 Md. 156; *Reg.* v. *Warringham,* Den. C. C. 447. Where, being doubtful, the court leaves it to the jury to determine whether a proffered statement or confession was voluntarily made, it is reversible error. *State* v. *Dunn,* 64 Md. 265.

12. The prayers of the defendants, appellants, on the subject of the statute of limitations should have been granted. Prosecutions under § 5440, U. S. Rev. Stat., are barred in three years. The gist of the offense is conspiracy. *United States* v. *Hirsch,* 100 U. S. 33; Wright, Criminal Conspiracy, citing *United States* v. *Donau,* 11 Blatchf. 168; *United States* v. *Benson,* 70 Fed. 591; *Gantt* v. *United States,* 108 Fed. 61; *United States* v. *Britton,* 108 U. S. 199; *Dealy* v. *United States,* 152 U. S. 539; *Bannon* v. *United States,* 156 U. S. 464. The theory of a continuing crime, contended for by the prosecution, was invoked in aid of the prosecution in *United States* v. *Irvine,* 98 U. S. 450, and repudiated by the court. The proposition that the subsequent acts cannot affect the operation of the statute of limitations is supported by reason, the analogy of cited cases, and by direct authority. See *United States* v. *Owen,* 32 Fed. 534; *United States* v. *McCord,* 72 Fed. 159.

13. The prayers of the appellants relating to the weight that should be given by the jury to the testimony of interested parties, including the postoffice inspectors employed to find evidence against the accused, should have been granted. *United States* v. *Ybanez,* 53 Fed. 540; *United States* v. *Reeves,* 38 Fed. 409. As to testimony of detectives, see 1 Wharton, Crim. Law, 10th ed. § 149; *Preuit* v. *People,* 5 Neb. 377; *Needham* v. *People,* 98 Ill. 275.

14. The remarks of counsel for the Groffs in his address to

the jury should not have been permitted by the trial court. The judgment of conviction should be reversed on this ground. *Childres* v. *State,* 86 Ala. 87; *Martin* v. *State,* 63 Miss. 508; *Jenkins* v. *North Carolina Ore Dressing Co.* 65 N. C. 563; *State* v. *Williams,* 65 N. C. 505; *Bullard* v. *Boston & M. R. Co.* 64 N. H. 27, 10 Am. St. Rep. 367; *Noble* v. *Portsmouth,* 30 Atl. 419; *Robertson* v. *Madison,* 29 Atl. 777; *Furnald* v. *Burbank,* 30 Atl. 409; *Radford* v. *Lyon,* 65 Tex. 478; *Mykleby* v. *Chicago,* 49 Minn. 457; *Rudolph* v. *Landwerlin,* 92 Ind. 39; *Cook* v. *Doud,* 14 Colo. 483; *Forsyth* v. *Cothran,* 61 Ga. 278; *Hayes* v. *Smith,* 62 Ohio St. 186; *Bessette* v. *State,* 101 Ind. 85; *Moore* v. *State,* 21 Tex. App. 666; *Weatherford* v. *State,* 31 Tex. Crim. Rep. 530; *Beason* v. *State,* 67 S. W. 96; *State* v. *Blackman,* 108 Ga. 121; *Parker* v. *State,* 67 S. W. 121; *People* v. *Bissert,* 71 App. Div. 118, 75 N. Y. Supp. 630; *People* v. *Mull,* 167 N. Y. 247.

*Mr. Holmes Conrad,* Special Counsel for the United States, *Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, and *Mr. Charles A. Keigwin,* Assistant United States Attorney, for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The assignments of error on behalf of the several appellants have been commendably grouped by their counsel under appropriate heads for discussion, and these will be considered in the order of their presentation.

The first group embodies objections to the sufficiency of the indictment which were first raised on demurrers that were overruled, then on prayers for instructions that were refused, and, finally, on motions in arrest of judgment that were denied.

1. The first ground of the contention is that counts 2 to 12, inclusive, do not show the commission of any offense under the statute (Rev. Stat. § 5440, U. S. Comp. Stat. 1901, p. 3676) defining and punishing conspiracies to defraud the United States. As the sentence imposed upon each was not greater

than warranted by the conviction under count 1 alone, the judgment might be sustained, even if the insufficiency of the remaining counts were conceded.  *Claassen* v. *United States,* 142 U. S. 140, 146, 35 L. ed. 966, 968, 12 Sup. Ct. Rep. 169.    But as there may be some probable distinction between that case and this, on account of the different character of the offenses charged and of the evidence necessary to sustain them, that point will be passed without determination.    Returning to the contention before stated, we are of the opinion that it is untenable.    The introductory statement of the indictment was clearly meant to be applicable to all of the twelve counts.    Counts 2, 3, and 4, in charging the conspiracy, expressly refer to the "same dishonest scheme and arrangement described and set forth in the first count."

This reference is sufficient.    *Blitz* v. *United States,* 153 U. S. 308, 316, 38 L. ed. 725, 728, 14 Sup. Ct. Rep. 924; *Crain* v. *United States,* 162 U. S. 625, 633, 40 L. ed. 1097, 1098, 16 Sup. Ct. Rep. 952.    Moreover, as the omission to repeat the averments of count 1, setting out the dishonest scheme and fraud, to effect the object of which the remaining counts charged different acts, was formal, and no substantial rights of the accused could be prejudiced thereby, the defect, if any, would seem to be cured by § 1025, Rev. Stat. (U. S. Comp. Stat. 1901, p. 720) ; *Price* v. *United States,* 165 U. S. 311, 315, 41 L. ed. 727, 729, 17 Sup. Ct. Rep. 366; *Connors* v. *United States,* 158 U. S. 409, 411, 39 L. ed. 1033, 1034, 15 Sup. Ct. Rep. 951; *United States* v. *Rhodes,* 30 Fed. 431, 434; *Wright* v. *United States,* 48 C. C. A. 37, 108 Fed. 805, 810.

Count 5 alleges a conspiracy formed on a later date, to wit, July 1, 1901, and sets out the entire scheme to defraud and the means by which it was intended to be accomplished, and an act done to effect the object.    In these respects it is as complete and certain as count 1.

Of the remaining counts it is sufficient to say that they refer to count 5 in substantially the same manner as the counts before considered refer to count 1.

2.  The next objection lies to each and every count of the

indictment on the ground that, taken together, they fail to charge the commission of any offense. The specifications of the contention are that: (a) There is no charge of fraud. (b) There is no averment that the First Assistant Postmaster-General was ignorant of the facts set out as the scheme to defraud. (c) There is no charge that the First Assistant Postmaster-General was ignorant of the fact that the Groff fasteners could have been bought for 75 cents each. (d) There is no allegation that Machen made any false representations to the First Assistant Postmaster-General of the facts with reference to the said transactions or concealed from him the material facts thereof. (e) There is no allegation that the First Assistant Postmaster-General was deceived by any act done or thing said by Machen. (f) There is no charge that the First Assistant Postmaster-General did not know, or could not have known, by the exercise of due diligence, all the facts relating to the purchase of the Groff fasteners.

The indictment avers that Machen, as superintendent of the free-delivery division of the Postoffice Department, was charged with the duty of ascertaining the cost of articles needed in the administration of the business of that division, and, when so ascertained, with, in good faith, advising the First Assistant Postmaster-General to order the purchase of, and payment for, the same at the price. Therefore, when, as is also charged, he advised and procured the purchase of any number of such articles at the price of $1.25 each, knowing, at the same time, that they could be bought for 75 cents, the proposition that the United States were defrauded is too plain to admit of argument. If, then, as charged, he confederated with others in the doing of such an act, all concerned therein were guilty of a conspiracy to defraud the United States. The fact that he may have participated in a division of the proceeds of such transactions aggravated the offense, and supplied express evidence of his corrupt intent as well as a circumstance tending to show the existence of the conspiracy.

3. As regards the objection that the indictment fails to. charge the want of knowledge of the First Assistant Postmaster-

General, or that he had been deceived and fraudulently imposed upon by the acts and representations of his subordinate, Machen, it is enough to say that the conspiracy charged was one to defraud the United States and none other. The First Assistant Postmaster-General was not the United States, but their agent merely, as was Machen also, and his knowledge, if such were the case, could not be imputed to them so as to prevent criminality from attaching to the latter's conduct.

It was proved on the trial that the First Assistant Postmaster-General had no knowledge of the conditions under which the purchases were made; but had it been shown that he had full knowledge, or was even a party to the conspiracy, the fraud perpetrated upon the United States would be none the less. In support of the general principles, see *Ochs* v. *People,* 25 Ill. App. 379, 414, 124 Ill. 399, 426; 16 N. E. 662; *State* v. *Cardoza,* 11 S. C. 195, 230.

2. The second group of assigned errors is founded on the refusal of several instructions prayed on behalf of the defendants, and would be the subject of consideration later, in regular order. But, as stated by their counsel, they raise questions cognate to those discussed under the preceding group and may therefore, for convenience, be considered in the order adopted by them.

The refused instructions, numbered 11 and 12, are to the effect that the scheme of fraud charged in the indictment is the alleged excessive price paid for the Groff fasteners, and that evidence of the number recommended to be purchased by defendant Machen, or of his activity in their introduction, cannot be considered as supporting the charge of the excessive price in determining the guilt or innocence of any one of the defendants. Charge 13 is to the effect that if the Groffs did not offer the fasteners to the government for 75 cents each, and that $1.25 was a fair and reasonable price, then there was no fraud upon the government, and the defendants should be acquitted. Charge 26 is to the effect that if the price of the fastener was fixed by the government before the time that Lorenz met either of the Groffs, or before he acquired any interest in the same or

the profits derived therefrom, then the defendants must be acquitted. Charge 19 is to the effect that, if a conspiracy was entered into by Machen and Lorenz to defraud the United States by the sale of the Groff fasteners, but the Groffs were ignorant of such agreement or conspiracy, then all the defendants should be found not guilty.

(1) The charge in the indictment in respect of the contemplated fraud was not the recommendation of the purchase of an unnecessary article, or of quantities of a needed article in excess of the requirements of the service, or "undue activity" on the part of Machen in recommending the purchase of necessary articles, but, as has been heretofore stated, the recommendation of their purchase at the price of $1.25 each, when he and the parties conspiring with him knew that they could have been purchased for 75 cents. The confederation to obtain this excessive price for a large number of the fasteners through Machen's use of his powers and opportunities as the adviser of the First Assistant Postmaster-General in such matters is the conspiracy charged. The fraud was in the price to be obtained, without regard to quantity.

By the terms of § 5440, Rev. Stat. (U. S. Comp. Stat. 1901, p. 3676), a mere conspiracy to defraud is not punishable. To make it so one or more of the conspirators must do some act to effect its object. Hence, after charging this conspiracy, the several counts allege separate and distinct acts of purchase at the excessive price, payment therefor, and further, the division of the same from time to time as received. In order to convict under each count it was necessary to prove each act as alleged. The evidence of each purchase of, and payment for, the fasteners consisted of documents on file in the Postoffice Department, and necessarily showed the quantity in each instance. This evidence could have been introduced for no other purpose than to prove the direct charges of the indictment and its several counts, and no exception has been taken to a single expression in the charge of the court that would permit its consideration by the jury for any other purpose. We are of the opinion, there-

fore, that instructions 11 and 12 were not so far relevant as to
make their refusal erroneous.

(2) Instruction 13 was properly refused as irrelevant and
misleading, because the issue was not whether the price paid
was a fair and reasonable one, but, as before stated, whether it
was 50 cents in excess of a price which the patentees and manu-
facturers were willing to receive. And evidence of the ar-
rangement between them and Lorenz through which they were
to receive that sum was as competent to show that willingness,
under the charge of the indictment, as evidence of a direct offer
to Machen, the representative of the contemplated purchaser, to
sell for that price, would have been. After refusing instruc-
tion 13, the court gave another requested by the defendants em-
bodying the foregoing view and stating that proof of this wil-
lingness of the Groffs was necessary to the establishment of the
fraud and the conviction of the accused.

(3) Instruction 19 was also properly refused. By no possi-
ble construction of the indictment could the conviction of Mach-
en and Lorenz be made to depend upon the fact that the Groffs
were also parties to the conspiracy.

(4) There was no error in refusing instruction 26. Wheth-
er the defendants were guilty of the offense charged in the in-
dictment could not be made to depend upon the fact that the
United States may have fixed the price of Groff fasteners at
$1.25 or more in purchases made before the Groffs and Lorenz
met or made their agreement. The evidence of such fact was
proper for the consideration of the jury as a circumstance mere-
ly, and for the same purpose that they were directed in a spe-
cial charge, given at the request of the defendants, to consider
the action of Machen in 1899, voluntarily and without sugges-
tion from a superior officer, reducing the payment for fasteners
from $1.50 to $1.25 each.

3. The next question for consideration is presented by the
assignment of error on exceptions taken to the refusal of the
court to require the prosecution to elect upon which one of the
twelve counts of the indictment the defendants should be tried.
Whether such a request should be granted depends upon the spe-

cial circumstances of the case, and rests in the sound discretion of the trial court. We are of the opinion that there was no abuse of that discretion in this case. *Pointer* v. *United States,* 151 U. S. 396, 400, 403, 38 L. ed. 208, 211, 212, 14 Sup. Ct. Rep. 410; *United States* v. *Neverson,* 1 Mackey, 152, 165; *United States* v. *McBride,* 7 Mackey, 371, 380; 1 Bishop, Crim. Proc. § 457.

4. In the course of the selection of the jury the defendants claimed the right of each to 10 peremptory challenges, making 50 in all, but were restricted to 10, which they shared according to a proportion agreed upon between them. The question raised by the error assigned on exceptions that were duly reserved requires the construction of § 918 of the District Code, and is one of grave importance. Section 918 forms a part of the Code approved March 3, 1901, and made to take effect January 1, 1902. It was amended June 30, 1902, by inserting the words "or the District of Columbia" after the United States in the last sentence. As amended, it reads as follows: "In all trials for capital offenses the accused and the United States shall each be entitled to 20 peremptory challenges. In trials for offenses punishable by imprisonment in the penitentiary the accused and the United States shall each be entitled to 10 peremptory challenges. In all other cases, civil as well as criminal, in which the plaintiff is the United States or the District of Columbia, each party shall be entitled to 3 peremptory challenges; and, if there are several defendants, they shall be treated as one person in the allowance of such challenges." [32 Stat. at L. 536, chap. 1329.]

Section 819, Rev. Stat. (U. S. Comp. Stat. 1901, p. 629), which regulates the practice in the United States courts throughout the States, without doubt requires that where there are several defendants in a case of any character they shall be deemed a single party for the purpose of all challenges thereunder. This provision is the conclusion of the general sentence providing for all trials save for treason or a capital offense, and is separated from the preceding part by a semicolon. The like provision— differing somewhat in phraseology, it will have been observed—

forms part of the third and last sentence of § 918 (D. C. Code), and is also preceded by a semicolon.

The contention on behalf of the appellants is that this inclusion in the sentence relating to all other cases, and the concluding words, "such challenges," make it clear that the limitation was not intended to apply to the challenges allowed in the first two sentences.

We are unable to concur in this contention. In stating the grounds of this conclusion, we regard it as unimportant to discuss the rule of the common law in respect of the peremptory challenges that were allowed defendants in criminal cases, or the frequent legislation relating thereto since 1790, to which our attention has been called. It is sufficient to say that the general policy of that legislation has been to restrict the privileges of defendants and to increase those of the United States in criminal cases generally. The last general legislation was that of June 8, 1872, contained in § 819, Rev. Stat., heretofore mentioned. The intention to change the rule thereof as regards the first classes of offenses—"treason or a capital offense," and "any other felony"—by increasing the number of challenges allowed the United States in trials in the District of Columbia, is expressed in § 918 of the Code in terms of absolute certainty. Pains were taken, moreover, to remove any possible doubt as to the offenses that might be included in the words "any other felony," as used in the general statute, by substituting therefor the words, "offenses punishable by confinement in the penitentiary." If there was a further intent to make a radical change of policy by limiting the provision requiring several defendants to be treated as one, to the lesser cases that were last mentioned in the statute, the failure to indicate it with something like the same certainty is inexplicable. The concluding words, "such challenges," as readily relate to the challenges allowed in the trial of offenses of one class as of another; and if this provision, independent and general in its nature, had been separated from the preceding one by a period, or a colon even, instead of a semicolon, the speciousness of the argument for limiting its application thereto would be apparent. The question, then, is reduced

to this: Whether by using the semicolon—in respect of which the form of the construction of the last sentence of § 819 has been adopted—a particular intention is manifested to limit the application of the provision. In view of our conception of the general intention, we must give a negative answer to this question. It is well settled that in the construction of statutes courts will, "for the purpose of arriving at the real meaning and intention of the lawmakers, disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute." *Hammock* v. *Farmers' Loan & T. Co.* 105 U. S. 77, 84, 26 L. ed. 1111, 1113; *United States* v. *Lacher,* 134 U. S. 624, 628, 33 L. ed. 1080, 1083, 10 Sup. Ct. Rep. 625; *United States* v. *Isham,* 17 Wall. 496, 502, 21 L. ed. 728, 729; *Keck* v. *United States,* 172 U. S. 434, 438, 43 L. ed. 505, 507, 19 Sup. Ct. Rep. 254.

5. The next assignment of error comprehends a number of exceptions that were taken to the admission of certain evidence on behalf of the United States. The first group of these are closely related, and can readily be considered together.

(1) Having proved that Machen was superintendent of the free-delivery division in the office under the immediate direction of the First Assistant Postmaster-General, and his duties as charged in the indictment by J. J. Howley, who had for years been private secretary to the First Assistant Postmaster-General and then chief clerk in his office, the witness was asked what was the import to the First Assistant Postmaster-General of Machen's initials indorsed upon letters in the usual method and course of business prevailing in the office. Objection to this on the ground that the witness had shown no knowledge of the matter having been overruled, he answered: The initials of Machen upon a letter or other document coming from his division indicated that it was regular and correct, and that there was nothing for the First Assistant Postmaster-General to do but sign the same. Other evidence was then given without objection, tending to show that about one hundred letters per day were submitted to the First Assistant Postmaster-General for signature; that it was physically impossible for him to read

them all and investigate their subject-matter; that it was his practice to sign most of said letters in reliance upon the initials of the various chiefs from whose divisions they came; that it was only in exceptional cases, as where his attention was specially directed to some matter, or where he was led to question the propriety of a letter or document, that he instituted inquiry; that he personally prepared no letters and knew nothing of the needs of the service except as from time to time informed by the chiefs of division to whom the duty of advising him had been committed.

Robert J. Wynne, then First Assistant Postmaster-General, was introduced as a witness. Having been shown a letter addressed to the Groff Brothers, July 9, 1902, and signed by him, on which the initials, "A. W. M.," appeared, ordering 5,000 complete fasteners to be shipped to consignees at Adrian, Michigan, he said that he had personally nothing to do with the preparation of the letter, or with the question whether such supplies were necessary or not, and had signed it relying upon the initials of Machen indorsed thereon. This last statement was objected to. Witness then further stated, under objection, that Machen was charged with the duty of deciding for him everything relating to supplies, in all instances where no question was raised; and would indicate his decision by indorsing his name or initials; where a question was raised it would be brought to the witness for decision. The objections were that the evidence was not warranted by any averment of the indictment. Motion was then made to exclude the answers on the further ground that the duty in respect of these matters was imposed by law on the First Assistant Postmaster-General; that it was incompetent for him to show his failure to perform his duty and its imposition by him upon others contrary to law. This having been overruled, the witness explained at length the volume of business in his office, embracing the expenditure of $60,000,000 to $70,000,000 per year, and the duties of Machen, and his reliance upon him in respect of the needs of his division, the quantities and prices of articles, etc. He also explained that he would only decide upon personal examination

when an objection was made, or information came to him that too much was being paid, etc. He was then permitted to say, over objection, that he knew nothing of the merits or demerits of the order heretofore mentioned, except what was imported by the initials of Machen thereon. This last objection was on the ground that there was no allegation in the indictment, either that the witness knew anything of this transaction, or that he was ignorant of any of the facts constituting the scheme to defraud.

The objections to Wynne's testimony are not well taken. In so far as they involve the allegations of the indictment respecting his knowledge or want of knowledge they have been settled in passing upon the sufficiency of that instrument.

Nor can the defendant Machen escape the consequences of his misconduct in the discharge of the duties imposed upon him by the rules and usages of the office, on the ground that those duties were imposed by the law upon the First Assistant Postmaster-General, and therefore could not lawfully be intrusted to the chief of a division, as they were. The law merely marks out the outlines of the powers and duties of the First Assistant Postmaster-General in the administration of his office. He is not forbidden the exercise, within those outlines, of some discretion in their performance, and the duties imposed upon Machen were within that discretion. *United States* v. *MacDaniel,* 7 Pet. 1, 14, 8 L. ed. 587, 592; *Tyner* v. *United States,* 23 App. D. C. 324, 355.

In respect of the evidence of Howley, which is of similar purport, it is sufficient to say that he was apparently well qualified to testify to the usage of the office.

(2) There was no error in admitting the evidence tending to show the actual cost of the Groff fasteners. It was a material circumstance for the consideration of the jury in determining the question whether the Groffs had been willing to sell for 75 cents an article for which the United States paid them $1.- 25; and also in ascertaining the real nature of their relations with Lorenz, who was charged with receiving the excess and

dividing it with Machen, his (Lorenz's) proportion being 50 per cent of the profits of sales.

(3) Regarding the exceptions taken to the admission of statements made by the several defendants, but not in the presence of each other, after the termination of all acts in furtherance of the object of the conspiracy, it is sufficient to say that each was expressly offered and received as evidence against the party making the same alone. And in the charge the jury were told that these statements could only be considered against the parties who made them, and then only for the purpose of connecting them with the conspiracy if they should find that one had been entered into; and further that "this evidence is not to be considered by the jury in considering the question as to whether or not the defendants are guilty of the crime of conspiracy, but only as tending to prove the relation which the parties making the same may have had to any conspiracy that may have existed prior to that time." There can be no question of the admissibility of the declarations under these limitations. *Sparf* v. *United States,* 156 U. S. 51, 54, 39 L. ed. 343, 344, 15 Sup. Ct. Rep. 273.

(4) In connection with the foregoing, it is convenient to consider another exception taken to the admission of certain acts of the defendants, individually, as well as their statements or declarations, that is embraced in another assignment. Some of this evidence consisted of official documents relating to the purchase, payment, and installation of Groff fasteners, which bore the indorsement of Machen as superintendent, and the objection was that to authorize their admission there must first have been prima facie evidence of the existence of the conspiracy. The general rule in such cases is that the order in which testimony shall be received is ordinarily a matter resting in the sound discretion of the trial court. *Bloomer* v. *State,* 48 Md. 521; and see 8 Cyc. Law & Proc. p. 682; 12 Cyc. Law & Proc. p. 442, where numerous decisions sustaining this doctrine are cited. Considering the peculiar character of the case on trial and the necessary nature of the circumstances relied on to prove

the charge of the indictment, we are of the opinion that there was no abuse of that discretion in this instance.

(5) In the course of the cross-examination of the defendant Machen, who testified on his own behalf, the prosecution was permitted to ask him if he had any other sources of income than his official salary. Considering the nature of the evidence offered to establish the conspiracy, and the nature of the explanation offered by the witness to account for the receipt of money from Lorenz, the question was not irrelevant.

(6) The last exception under this assignment relates to the introduction of a letter from the postmaster at Boston and one from the postmaster of Cleveland. Both were addressed to the First Assistant Postmaster-General, and bore dates of May and June, 1896, respectively. These letters contained certain criticisms of the Groff fasteners. As a witness, Machen said that the Boston postmaster in his letter about that time protested against the introduction of the fastener in that city and gave five reasons therefor. Nothing was said by him of the other letter. The letters need not be set out. They merely state certain reasons why, in the opinion of the writers, the introduction of the fasteners in their respective cities was not advisable. These letters, with or without proof of the signature of the writers, were irrelevant. They contained nothing bearing upon the conspiracy charged and attempted to be proved, for, as heretofore stated, there was no pretense that Machen acted improperly or fraudulently in advising the adoption of the Groff fasteners. The charge of conspiracy was to defraud the United States by advising their purchase at an excessive price. Bearing this in mind, as Machen substantially stated the contents of the Boston letter, and neither letter tended to contradict any evidence offered by the defendant, and in view of the further fact that witnesses for the United States had themselves testified to the efficiency of the Groff fastener and its superiority to all others, the admission of the letters was harmless error. They could have exercised no possible influence over the minds of the jury.

(7) In this connection may be considered, also, certain ex-

ceptions, embraced in another assignment, to two letters, called the "Donovan letters," because produced by a witness of that name from the files of the Washington city postoffice, and to several letters addressed to the witness Clark. The Donovan letters were addressed to the postmaster of Washington and purported to have been signed by Machen. One requested leave of absence for ten days for John F. Clark, an employee, to enable him to install Groff fasteners in New York. The other asked to have a drill used in the work forwarded to New York. Donovan produced these letters from the files of the city office, and said that they came in the mail, and said that he had never seen Machen write, but had seen his name on letters. Clark testified that he was an employee of the Washington office at the time mentioned in the Donovan letters, and understood the working of the Groff fastener; that he had been sent for by Machen to take down an experimental box that had been put up in the city, and had done so in the presence of Machen and Samuel A. Groff; that subsequently Machen sent for him and asked if he understood working the Groff fastener; that as a result of the conversation he was sent by Machen to Baltimore, and having done the work there returned to Washington; that subsequently he was sent to New York and other cities for the same purpose; that the letters produced by him purporting to have been signed by Machen came to him by mail, from time to time, in the course of his travel and work in the several cities mentioned; that he sent in his bills for wages and expenses to Machen's office in Washington, and received the orders for money therein mentioned as well as in the letters, and had received payment of the same from the several local postmasters. He said that the letters looked like Machen's handwriting, though there was a vast difference between the signatures on two of them; and further, that he could not say he was personally acquainted with Machen's handwriting. The first letter, addressed to Richmond, notified him that the postmaster of Richmond had been instructed to pay for work done $362.38, to be divided, according to the bill presented, between him and certain named assistants. The second, also to Richmond, in-

formed him of the receipt of his letter relating to railway fare
and pay, and that the matter would be taken up on his return
to Washington. The third, addressed to St. Louis, was similar
in purport to the first one (substituting St. Louis for Rich-
mond), and in addition asked for a statement of his railway
fare showing date of leaving Washington, and asked him to ar-
range to report at Washington on August 1. The fourth and
last letter was addressed to Toledo, Ohio, but related, as did the
first, to the payment of a bill for services by the postmaster of
Richmond, and added that the latter had been directed to send
him the money at Toledo by registered mail.

No objection to any of the foregoing letters was made on the
ground of irrelevancy or immateriality. It is possible that the
qualification of Donovan to testify to Machen's signature may
have been sufficient to warrant the introduction of the two let-
ters produced by him, especially when considered in connection
with the evidence by Clark relating to Machen's personal action
in accordance with them, leaving the final determination of the
genuineness of the signatures to the jury. See *Shaffer* v. *United
States,* present term [*post,* 417 ]. Likewise, the testimony of
Clark, showing interviews with and orders by Machen and the
payments by his authority of the money in accordance with the
statements of the letters, may have warranted the introduction
of those addressed to him. But these need not be determined.
For the same reasons that have been given in respect of the post-
master's letters before considered, these letters could have
worked no conceivable prejudice to the defendants.

6. The next question arises on exceptions taken to the intro-
duction of certain documents from the files of the Postoffice De-
partment and the sixth auditor's office therein. The estab-
lished usage of the office in making purchases, payments, etc.,
was as charged in the indictment and heretofore stated. It
had also been shown that when an article of supply had been ac-
cepted for permanent use in the service at a fixed cost, further
orders for the same at the fixed price were "routine matters."
All papers relating to a purchase were required to be filed in the
sixth auditor's office, who entered them in his accounts and di-

rected payments.   A great number of orders for Groff fasteners, with bills therefor and issue of warrants, etc., were offered in evidence, bearing the signatures of successive first assistant postmaster-generals, and what purported to be the name or initials of Machen indorsed.   These were of divers dates between the time of the original adoption of the Groff fastener and the last date named in a count of the indictment.   Some, if not all, the papers objected to were part of the seventeen files from the office of the sixth auditor.   These files are called audits and were made up of the original papers.   In most instances it was proved that Machen wrote his name or initials wherever shown by the papers.   In some the initials on the original order were not proved to be his, but on the bills presented therefor were so proved; and again, an order proved to have been indorsed by him would be accompanied by an approval of the bill not proved to be his initials or signature.   It is claimed by the appellants that the proof failed to show the genuineness in seven instances, including those last mentioned.   In the manner in which these papers are described and referred to in the testimony it is difficult to ascertain the exact fact.   It is sufficiently clear, however, that as regards one or more, at least, there was a failure to prove the fact that Machen had indorsed them.   These appear not to be one of those transactions specifically described in the counts.   In all instances the genuineness of the receipts of the money in payment by the Groff Brothers was proved or admitted.   In all instances, also, it was shown that Groff Brothers had transmitted 40 per cent of the receipts to Lorenz, and there was evidence tending to show that Lorenz had made payments to Machen therefrom amounting to one half of the same, in many instances at least.   Miss Ina S. Liebhart, who was called as a witness by the defendants, testified that she had been private secretary to Mr. Machen's predecessor, and then to him until January 22, 1902, when she became his chief clerk.   She said that Machen was a very busy man, having an immense correspondence, sometimes from 200 to 800 letters per day.   He had charge of all new devices.   That he instructed her to initial all letters, bringing to his attention such only as in her

judgment involved matters that he ought to know about. That she initialed all the letters for him, but when she was absent he initialed them himself. That she brought to his attention anything that she had doubt about, or that involved a change of policy. That she remembered no instance in 1900 of bringing to his attention any letters about Groff fasteners because they were then routine matters. That they had been fixed supplies during the time she was employed, both as to character and price. The Groff fastener was then a fixture in the service as a standard supply. That in case of a fixed supply it was her custom to initial the matter. That if it had related to fasteners of another kind or at a greater price she would have taken it to the superintendent. That "the number of Groff fasteners was determined entirely by the number of boxes. The number of city boxes was determined by the requisitions of postmasters, and in the rural service by the reports of agents, special agents, and route inspectors. The clerk in charge would tabulate and make up the number of boxes to be ordered on blanks furnished for the purpose. The presence of the initials in the left-hand corner of such a letter would indicate that it had passed through the office of the clerk in charge of supplies. I would merely look into the question as to whether the letter ordered something already established in the service and gave the correct price." That she made no effort to imitate Machen's handwriting, and her custom of entering his initials was not secret, but known to the chief clerk and others, including Mr. Wynne, she thought, in the office of the First Assistant Postmaster-General. That a system of auditing rural free-delivery accounts and getting them in proper form for the auditor of the Department, was inaugurated by Machen in his own division and became a permanent feature. That the duties of Speich, this special auditor, were to receive all bills and to get them in proper shape for presentation to the auditor; to make a record of them, back them, and send to witness's desk for initialing; that finding everything correct the certificate of amounts would sometimes be initialed by Machen and sometimes by her. On cross-examination, she said that sometimes she could distinguish her initials

from Machen's and sometimes not. (This was illustrated in her examination of the audits referred to. In some instances she was not able to say whether the initials "A. W. M." had been written by her or by Machen.) That she derived her authority from Machen, who indorsed everything that she did. Speich, the special auditor, testified to the manner in which he made up and jacketed the orders, bills, etc., and after final approval issued the warrants, which were either signed or stamped with Machen's name. Machen, as a witness, said that prior to 1901 Miss Liebhart frequently initialed letters on his authority. That when he designated her as chief clerk he told her to relieve him entirely of the initialing or signing of all matters, and to bring to his attention only those letters which involved initial action in matters, or which in her judgment required his personal attention. He said: "I have always assumed responsibility for every initial and signature she ever made and I stand for it to-day. The bulk of the warrants with the auditor's slips on them were initialed by Miss Liebhart; she numbered probably 75 per cent of them; I never saw these, but it would not have made any difference if I had seen them; I would have initialed them if she had not." He further said that, having established the system to fix the fasteners to rural boxes, "the work in the office went on automatically. Here is an order for 6,000 fasteners of October 22, initialed by Miss Liebhart acting in my absence; I was in Michigan at the time, and therefore could have had no personal knowledge in this transaction, although I assume the responsibility for it."

In determining the question it is to be borne in mind that the Groffs are not directly affected by it because of the proof and their admissions as to the bills made out and the receipt of the several sums of money; nor is Lorenz by reason of the proof as to him. It is to be remembered that the fraud charged is not as to the adoption and the purchase of the fastener at any time, or in numbers not actually delivered to and used by the United States, but consists in the excessive price paid in each instance actually charged in the indictment. The transactions not specified therein in the course of which Lorenz received the pay-

ments of the excessive cost, whether before or after the dates charged in the indictment, constituted circumstances in the general chain thereof tending to show the existence of the conspiracy charged. On the ground that these records are the necessary basis for the accounts of the sixth auditor, and merely show, formally, the payments made by the United States as charged up against the regular appropriation for the general purpose, it is contended on behalf of the United States that they are admissible, without further proof, under § 889, Rev. Stat. (U. S. Comp. Stat. 1901, p. 671). The applicable portion of that section reads thus: "Copies of the quarterly returns of postmasters, and of any papers pertaining to the accounts in the office of the sixth auditor, and transcripts from the money-order account books of the Postoffice Department, when certified to by the sixth auditor under the seal of his office, shall be admitted as evidence in the courts of the United States in civil suits and criminal prosecutions." And this seems to have been the view of the trial court, because the papers were all introduced without the proof of any signature, that proof having been offered afterwards, as would seem to be indicated by the bill of exceptions.

Now, as there is no charge of falsification of the accounts themselves, and the records contain no admission by Machen of any criminality in respect of the conspiracy to obtain an excessive price for the fasteners, but were part of the usual and necessary routine of the office for keeping the accounts of the department in accordance with the appropriations made for its use, it may be possible they were made evidence by the statute. See *United States* v. *McCoy,* 193 U. S. 593, 601, 48 L. ed. 805, 808, 24 Sup. Ct. Rep. 542. And if certified copies would be admissible there is no good reason why the originals themselves would not be. *Bruce* v. *Manchester & K. R. Co.* 19 Fed. 342, 346, citing *Cate* v. *Nutter,* 24 N. H. 108.

That point, however, need not be determined, for we are clearly of the opinion that, even if error was committed on that ground, it was cured by the subsequent testimony of Miss Leibhart and the admissions of Machen. Both testified, as we have

seen, that they were matters of routine. The fastener had long been adopted and the price fixed. Orders were made, as a matter of course, upon the requisitions of postmasters and the returns of special agents equipped with blanks for the purpose. Miss Liebhart acted as the agent of Machen to approve and send in all formal orders, and to approve bills presented in accordance therewith at the fixed price. In the occasional absences of Machen his place was temporarily taken by one of his subordinates, but, as he himself said, having once established the system regarding the fasteners, "the work in the office went on automatically." Moreover, Miss Liebhart remained to represent him, and when she was absent she says that he signed or initialed the papers himself. As we have seen above, he said that he gave her this authority (which relieved him of routine work), and that he had always assumed, and still assumes, responsibility for her acts; and further, that if she had not initialed the papers for him he would have done it himself. Again he said that the fact that she was signing his name and initials was known to First Assistant Postmaster-General Johnson and Wynne, and to their chief clerks or secretaries, and that none of them ever objected to it until April, 1903, when Wynne ordered that chiefs of divisions should in person sign or initial all matters of the kind. Agency and authority could not well have been more direct and complete.

7. The leading exceptions embraced in the ninth assignment of error, relating to the order of the introduction of evidence of the acts and statements of the defendants, have been heretofore considered. Of those remaining all that need be said is that the wide range of the evidence concerning the purchase of fasteners and the receipt and division of the money paid therefor was no more than has generally been permitted in all cases where fraud and conspiracy must necessarily be established by circumstantial evidence.

8. In the course of his evidence on his own behalf Lorenz testified to the conversation with Machen that is mentioned in the preliminary statement as having been had on a boat on a lake trip. His counsel then sought to prove by him at whose in-

vitation he took the trip, who accompanied him, and the names of other persons on the boat. In excluding this proof as immaterial and incompetent we think there was no error.

9. Miss Liebhart was introduced as a witness by the prosecution to give evidence of certain matters, and the eleventh assignment of error is on exceptions taken to the refusal of the court to permit her to answer certain questions asked by defendants on the ground that they were outside the scope of regular cross-examination.· Whether this ruling was correct need not be inquired into, because, when called afterwards by defendants, they were permitted to ask, and elicit answers to, the very same questions.

10. The twelfth assignment of error is founded on special exceptions taken to the admission of statements claimed to have been made by Diller B. Groff to inspectors of the Postoffice Department. The effect of the evidence was that Groff had been questioned by the inspectors, and that he had subsequently signed the written statement prepared by them containing questions and answers. The material parts of these statements were that no one but himself and brother were interested in the fastener; that no payments were made to the Lorenz's, and that he was not acquainted with either of them. Four inspectors testified to visits made to Diller B. Groff, to inquiries made of him, to his statements in reply, and to the subsequent reduction of the same to writing and to his signing the same without force, threats, or inducements offered. Groff was a resident of the city of Washington, and engaged in business there as a builder of houses, etc. His brother and partner, Samuel A. Groff, the inventor of the fastener, was a member of the District police force.

Diller B. Groff testified, in support of the objections, that two of these inspectors called at his house and said they wanted a statement regarding the sale of fasteners. That he had had an attack of insomnia and swimming of the head the night before; had slept about two hours only, and the night before that not at all. That he told them this, and desired them to put it off to another day, to which they replied, "We have got to have

the statement now; there is no putting it off." That one pushed him aside and took a seat at the table; the other sat at the desk. That "their manner was overbearing and gruff,—a kind of a bulldozing disposition." On cross-examination he said that the paper was read to him and he signed each page; did not read it himself; that when asked if he swore to it, he said, "Yes, of course;" that some time later two inspectors called and talked about this paper; that they said they wished to catch two men, and could do this if he made a statement; that they promised in that case to return the statement aforesaid and pay him $13,000 which the government owed him; that he and his brother would be given immunity; "would be put into the government band wagon, on the grand stand;" that he told them he stood by the statement as far as it related to government officials. (That statement had denied any wrongdoing on the part of himself or any officer of the government.) William Thomas then testified on behalf of Groff. He said he was a friend of many years, and was at Groff's house when the first two inspectors came to get the statement. He corroborated Groff as to his statements to them of illness, and as to their threatening and commanding manner, but he heard no threats. Groff did not ask him to remain, and he left before the statement was made. The inspectors who took the statement of Groff denied his statements as to illness, threats, threatening manner, and offer of immunity. The two others to whom Groff attributed the offer of immunity, and statements regarding catching officials, specifically denied the same, as well as the use of threats. The interviews occurred before any prosecution had been instituted, but Groff was arrested on complaint made by one of the inspectors during the afternoon after the last interview. The written statement was then read over the objection of the defendants that it had been made under duress and promise of reward, as well as upon the ground heretofore considered; that no prima facie case of conspiracy had been made as a basis for it. The court ruled that he would admit the statement with the instruction to the jury not to consider it against the other defendants.

The admonition in the general charge to that effect has been before mentioned.

At a later stage of the case, Diller B. Groff (a son of the defendant of that name) was called as a witness, and testified generally in the case, concerning the sales of the fasteners and the contract by which Lorenz acquired his interest. He was thirty-one years old, and acted in a clerical capacity for his father in the transaction of the business. He was then examined in regard to one of the visits of the inspectors and testified as follows:

"I heard a portion of the conversation between my father and Mr. Mayer and Mr. McKee. In looking out of the window I saw coming across the street six or eight men, my father and two men, my uncle, as I remember, with two other men, and several other men following them. After I had gotten my papers I went downstairs, and I heard voices down there and listened. I had heard of a statement my father had made earlier in the year, and when I came down and heard these voices I listened. I was on the second floor of the house. I was at the hall door, and could not see who was in the room. I could not hear all the conversation, but heard someone say: 'What we want you to do, Mr. Groff, is to come on the government's side, and get into the government's wagon, and we will see that you and your brother both get immunity.' Then, again, the proposition was made to him. They said they needed them and that they would give them both immunity, and that the $13,000 would be paid and the statement made would be returned. The voice was that of Mr. Mayer. My father turned them down flat-footed, and said he knew nothing about Mr. Machen. I heard them mention the Second National Bank. I heard them say that my father was paying money to persons to whom he had no right to pay it, and that he was being robbed, and my father said, 'I guess not.' I heard the name of Lorenz mentioned. On the morning in April when my father made that statement he was languid, and appeared to be a very sick man. He had not slept at all that night, said he felt very miserable, and I could tell from his conversation that he was not himself.

I know that the day previous to this he had not slept at all. He suffered before from sleeplessness, and he has suffered since."

In submitting the case to the jury the court gave the following special instruction at the request of the defendants:

No. XXX. "The jury are instructed that before they can consider the written statement of Diller B. Groff, alleged to have been made and sworn to by him on the 3d day of April, 1903, as evidence in the case they must first find from the evidence in the case that said statement was freely and voluntarily made by said Groff.

"And, in determining the question whether or not said statement was freely and voluntarily made, they may examine all of the evidence in the case with relation to such statement, and if they find from such evidence that said statement was procured or extracted from said Groff by any sort of threat or violence, or obtained by any direct or implied promise, however slight, or by the exertion of any improper influence on the part of the postoffice inspectors securing such statement, then they are instructed that such statement is not a free and voluntary statement, and should be disregarded by them, and not considered in determining the question of the guilt of said Groff."

When there is a conflict of evidence on the question whether a confession has been obtained by force or threats, or by holding out offers of immunity or reward, the question is one primarily for the decision of the court. If satisfied that it was voluntary he may admit it, leaving its final determination, however, to the jury, as was done in this case. *Wilson* v. *United States,* 162 U. S. 613, 624, 40 L. ed. 1090, 1096, 16 Sup. Ct. Rep. 895; *Davis* v. *United States,* 18 App. D. C. 488, 490; *West* v. *United States,* 20 App. D. C. 347, 352; *Brady* v. *United States,* 1. App. D. C. 246, 250.

Where the circumstances under which it was obtained are such as reasonably indicate that it was not voluntary, then it would be an abuse of discretion to submit it to the jury at all. *Bram* v. *United States,* 168 U. S. 532, 42 L. ed. 568, 18 Sup. Ct. Rep. 183; *West* v. *United States,* 20 App. D. C. 347, 352.

There was not only a conflict of evidence in this case, but a

preponderance of evidence, also, in support of the admissibility of the statement, which was not a confession of guilt, but rather a complete denial thereof.    Moreover, the character of the statement itself, and all the surrounding circumstances of the transaction, tended to support the contention of the prosecution. We cannot say, therefore, that its admission and submission to the jury constituted error.

11. The questions raised by the thirteenth assignment of error on exceptions to a series of instructions given the jury at the request of the prosecution need not be discussed, for, as said by counsel in their brief, the same points have been considered under previous heads.

12. The bar of the statute of limitations was raised by the defendants in two special instructions which the court refused to give to the jury.    These are as follows:

"No. XVII. The jury are instructed that, even if they find from the evidence that the conspiracy to defraud the United States government, and complained of in the indictment, was entered into between the defendants, or any of them, in 1895, and that, prior to the 29th day of June, 1900, Machen recommended the purchase of fasteners to the First Assistant Postmaster-General, or that he or any other of the defendants did any overt act in furtherance of the conspiracy, no subsequent overt act done or committed by the defendant Machen, or by any of the other defendants, pursuant to and in furtherance of the said alleged conspiracy, will keep alive or renew the said conspiracy, and the offense or offenses charged in the indictment would nevertheless be barred by the statute of limitations, and all of the defendants should be acquitted.

"No. XVIII. If the jury believe from the evidence that a corrupt agreement was entered into by the defendants, or any two or more of them, in the year 1895, and an overt act was done by said defendants, or any of them, during said year to further the object of said corrupt agreement, and that no further and other agreement has since been entered into by said defendants, or any of them, in respect to the matters and things charged in the indictment, then the court, as matter of law, charges the jury that

the statute of limitations of three years is a complete defense to this action, and their verdict must be not guilty as to all of the defendants."

The court had previously given the following instruction at the request of the prosecution:

No. VII. "The jury are instructed that, in order to warrant a verdict of conviction, it is not necessary for the government to show, or for the jury to find, that the several conspiracies charged in the indictment, or any of them, were entered into upon the particular dates mentioned in the indictment. It is sufficient if it appear that the conspiracies alleged were entered into at any time within the period of three years before the filing of the indictment,—that is to say, at any times within three years prior to the 22d day of June, in the year 1903. The fact, therefore, if you find it to be a fact, that the conspiracies charged in certain of the counts were not, or could not have been, entered into on the days on which they are charged, should not prevent your finding a verdict of guilty upon those counts if you find they were entered into at some other time or times within three years prior to the said 22d day of June, 1903."

The dates of the conspiracy, and of the several acts in furtherance of its object, as charged in the indictment, are given as within three years next before that instrument was presented by the grand jury.

The contention on behalf of the appellants is that, if the conspiracy was in fact formed, and a single act in aid of its object committed, more than three years before the finding of the indictment, then the offense was barred by the statute of limitations; and that no other like act or acts, committed within three years, would amount to a renewal or continuance of the conspiracy so as to remove the bar.

We cannot agree with this contention. Undoubtedly, as argued, the conspiracy is the gist of the offense defined in § 5440, Rev. Stat. (U. S. Comp. Stat. 1901, p. 3676), though it is not indictable until some act shall have been done by one or more of the conspirators to effect the object of the corrupt agreement. The offense is then complete as to that act, and the statute at

once begins to run; but it does not follow that all similar acts thereafter may be committed with impunity. Through the repetition of such acts—overt acts, as they are commonly called— the conspiracy is made a continuing offense. By each subsequent act it is repeated and entered into anew. *People* v. *Mather,* 4 Wend. 259, 21 Am. Dec. 122; *Com.* v. *Bartilson,* 85 Pa. 482, 489; *Fire Ins. Cos.* v. *State,* 75 Miss. 24, 35, 22 So. 99; *Ochs* v. *People,* 25 Ill. App. 379, 414, 124 Ill. 399, 426, 16 N. E. 662; *United States* v. *Greene,* 115 Fed. 343.

13. Several assignments of error, grouped under one head, are on exceptions reserved to the refusal of the court to give three special instructions to the jury that were requested by the defendants. The first one is as follows:

"No. XXIV. The jury are instructed that the evidence of professional detectives upon disputed questions of fact arising in criminal cases should always be received with a large degree of caution. From the nature of their business, and the frequent and constant association with members of the criminal classes, their minds are oftentimes unduly biased and prejudiced against those accused of crime, and in whose arrest they have been instrumental, and their testimony thereby colored against them."

The next omits the use of the word "detectives," but directs that greater care should be used in weighing the testimony of persons interested in, or employed to find, evidence against the accused, than in other cases, "because the natural and unavoidable tendency and bias of mind of such persons to construe everything as evidence against the accused, and disregard everything which does not tend to support their preconceived opinions of the matter in which they are engaged."

The third is substantially of the same effect as the second.

We are of the opinion that the court did not err in refusing each of these instructions. Moreover, the inspectors, at whom the instructions were specially aimed, were not what are known as "detectives," but men occupying responsible public positions who made no concealment of their offices, their duties, or their purposes. All that the defendants had any right to demand is

contained in the following extract from the general charge of the court:

"You are the sole judges of all questions of fact, and in this respect the court cannot be of any aid to you. It is for you to say as to the weight which you may give to the evidence of any witness who may have testified during the progress of this trial, and, in passing upon the question as to the credibility of the different witnesses, you should weigh carefully, every fact and circumstance in connection with the evidence which has been submitted to you for consideration. You have had an opportunity of observing the conduct of the witnesses while on the witness stand, as well as the interest which any witness may have had in the transaction about which he may have testified, and these are matters which should be considered by you in determining the question as to the amount of weight that you are to give to the evidence of any witness who may have been introduced either by the government or by the defense.

"It is your duty to arrive at a conclusion in considering the facts and circumstances of this case the same as you would come to a conclusion upon any other set of facts in life. There is no technical rule which prevents you from applying to them the same rule of common sense that you would apply to any other subject that might come under your consideration."

14. Upon the conclusion of the evidence the counsel for the defendants asked the court to instruct the jury that there was no sufficient evidence in the case upon which they could find a verdict of guilty as to either Samuel A. Groff or Diller B. Groff. These instructions—a separate one for each—were refused.

It would serve no important purpose to consume time with a review of the voluminous evidence contained in the bill of exceptions, a general summary of which has been given in the preliminary statement. As regards Samuel A. Groff, the circumstances tending to show his connection with the conspiracy which the jury found to exist were neither so numerous nor so strong as those which tended to show the participation of Diller B. Groff therein, but we cannot say that they were insufficient to warrant the submission of the question of his guilt to the jury.

One potent circumstance tending to show his guilty knowledge of and participation in the conspiracy, needs only be mentioned as standing in the way of his request.    A written statement subscribed and sworn to by him on April 2, 1903,—nearly three months before the return of the indictment,—was read in evidence.    In this he said that no one but his brother and he were interested in the fasteners directly or indirectly; that they paid no fees and had no promoter to secure the adoption of the fastener.    This denial of the interest of anyone else in the fasteners was also testified to by three of the inspectors engaged in the investigation.    As a witness for himself he testified to the agreement with Lorenz by which the latter was to receive 50 per cent of the profits realized on sales of the fasteners.    It is true that he denied the correctness of the written statement, which, however, he did not deny signing.    Regarding the statement about no others being interested, he testified, "I said nobody, directly or indirectly, was interested in the patent; I did not say fastener."    There being a conflict of evidence on this point, the question was one which the jury only could determine.

15. The foundation of the twenty-ninth and last assignment of error is the following recital with which the general bill of exceptions concludes:    The special counsel for the United States in the closing argument before the jury said:  "Twenty years ago twelve men sat in these very chairs that you are sitting in now, in a trial that extended through five months in a court room,—the star route trial; one man hung the jury, the foreman of it.    He said he had a reasonable doubt, and what followed?    He was indicted for bribery; for being bribed for that reasonable doubt; he was tried, but he was not convicted because they could not prove it.    Do not imagine for a moment"—(interrupted).    "That thereupon objection was made by counsel for the defense as to the character of the comment of the counsel for the government."

Whatever addition might have been intended to be made, by way of explanation or qualification, at the moment of interruption, these remarks could have had no application to any issue in the case, and clearly exceeded the latitude permissible in argu-

ment upon any trial. Had the court, instead of interrupting counsel, permitted him to continue this line of argument, the judgment would have to be reversed. *Wilson* v. *United States,* 149 U. S. 60, 67, 37 L. ed. 650, 652, 13 Sup. Ct. Rep. 765; *Waldron* v. *Waldron,* 156 U. S. 361, 380, 39 L. ed. 453, 458, 15 Sup. Ct. Rep. 383; *Williams* v. *United States,* 168 U. S. 382, 398, 42 L. ed. 509, 515, 18 Sup. Ct. Rep. 92; *Washington &amp; G. R. Co.* v. *Dashiell,* 7 App. D. C. 507, 516; *Price* v. *United States,* 14 App. D. C. 391, 400. All that appears in the bill has been recited above, and it does not appear therefrom that any exception was taken to the action of the trial justice in the premises. Hence, apparently, anything that he may have said, done, or omitted, beyond the proper act of interruption, is not recorded. All that appears is that objection was made "as to the character of the comment of counsel," and it was interrupted. No action beyond that was asked of him, and the incident is not mentioned in any one of the various grounds set up in the motions for new trial that followed. As we had occasion to say in a case heretofore decided, *Yeager* v. *United States,* 16 App. D. C. 356, 362. "The justice having done all that he was called upon to do, there was no ground for an exception to his action. He could not, of his own motion, withdraw a juror and continue the case for trial before another jury, without affording the defendant, probably, good foundation for a plea of former jeopardy. The defendant made no such motion. If, as had been stated, he contemplated a motion of that, or any other nature, founded on the incident, he abandoned the idea and proceeded with the trial. Having thus elected to take the chance of a verdict, without motion or exception, there is no foundation for the assignment of error."

In the case at bar the defendants did not express an intention to make any motion whatever, as was done in that case, but that is of no consequence; they had the option to do so, with or without the expression of any intention. The trial justice could not, of his own motion, discharge the jury and order a new trial, and he could not be expected to direct a verdict of acquittal.

Having considered every point made on the elaborate briefs

and able oral arguments of counsel, for which last an extension of treble the time allowed by the rules of the court was granted, we have found no error in the proceedings on the trial for which the judgments ought to be reversed.

It will therefore be affirmed; and it is so ordered.

*Affirmed.*

A petition by the appellants to the Supreme Court of the United States, for the writ of certiorari, was denied by that court.